**NEWMAN, WILLIAMS, MISHKIN, CORVELEYN, WOLFE & FARERI**
A PROFESSIONAL CORPORATION

BY: GERARD J. GEIGER, ESQUIRE
LAW OFFICES
712 MONROE STREET
P.O. BOX 511
STROUDSBURG, PA 18360-0511
(570) 421-9090
(570) 424-9739 (FAX)
ggeiger@newmanwilliams.com

ATTORNEY FOR:  Monroe County – PA, Monroe County
District Attorney's Office, E. David
Christine, Jr., Esq., Michael Rakaczewski, Esq.,
and Wendy Bentzoni

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM SPIESS, et al.,<br>                    Plaintiffs,<br>v.<br><br>POCONO MOUNTAIN<br>REGIONAL POLICE<br>DEPARTMENT, et al.,<br>                    Defendants | No. 3:10-cv-00287-JMM<br><br>Honorable James M. Munley<br><br>Jury Trial Demanded |

**Brief In Opposition To Plaintiffs'
Motion To Amend Complaint (Doc. 55)
On Behalf Of Monroe County, Michael Rakaczewski,
and Wendy Bentzoni**

## I.    Procedural History

The plaintiffs filed this action on February 8, 2010, more than two

years ago.

1

On July 26, 2010, in response to a Rule 12(b) (6) motion, the Court dismissed all claims against the Monroe County District Attorney's Office and District Attorney E. David Christine, Jr. (Doc. 23).[1]

Since then, the parties have taken 23 depositions[2], engaged in voluminous written discovery, and received two extensions of the case

---

[1] The Court noted at that time that Christine was never personally named as a defendant. Instead, the plaintiffs intended only to name him in his "official capacity" which is a claim against Monroe County and not against Christine:

"Though plaintiffs' complaint did not clearly indicate whether DA Christine was being sued in his official or individual capacity, the plaintiffs have definitively stated in their briefs that Count VII sues Christine "solely in his official capacity as a final policymaker of Monroe County. Plaintiffs have not sued District Attorney Christine in his personal capacity." (Pls.'s Br. Opp. at 15 (Doc. 21 at 19); Compl. ¶ 174)."

See Doc. 23, at p. 19 n.6.

[2] These are the depositions taken to date:
1.  October 17, 2011: Chief Harry Lewis as corporate designee for Police;
2.  October 17, 2011: James Bedics;
3.  October 24, 2011: Jaleel Holden;
4.  October 24, 2011: Kasheen Thomas;
5.  October 24, 2011: William Spiess;
6.  October 25, 2011: Gene Thomas;
7.  October 25, 2011: Jose Lacen;
8.  October 26, 2011: John Velekei;
9.  October 26, 2011: Patricia Clancy Brennan;
10. March 14, 2012: Victim Witness advocate Maureen Egley;
11. March 15, 2012: MCCF Warden Donna Asure;

management deadlines (Doc. 40), not including the order recently filed

on April 16, 2012 (Doc. 54), which extended certain deadlines to address

plaintiff's motion to amend.

The case management orders provided for discovery deadlines as

follows:

     a.  Doc. 40: March 1, 2011;
     b.  Doc. 44 : September 1, 2011;
     c.  Doc. 46: February 15, 2012.

The last case management order (Doc. 46) filed last summer

(August 19, 2011), specifically stated there would be "No Further

Extensions."

The parties took all of the depositions based on the premise that

District Attorney Christine and the Monroe County DA's office were not

parties and that plaintiffs had no claim against DA Christine for his

---

  12.    March 15, 2012: Monroe CYS Asst. Administrator, Stacie Gill;
  13.    March 19, 2012: Detective Richard Luthke;
  14.    March 21, 2012: Lt. Chris Wagner;
  15.    March 21, 2012: ADA Michael Rakaczewski;
  16.    March 22, 2012: Detective Ken Lenning;
  17.    March 23, 2012: Detective John Bohrman;
  18.    March 23, 2012: Sgt. Lucas Bray;
  19.    March 30, 2012: Dr. Andrea Taroli (at Hershey Medical Center);
  20.    April 10, 2012: Detective Wendy Bentzoni;
  21.    April 13, 2012: Chief Harry Lewis, in his individual capacity;
  22.    April 13, 2012: Carol McDonough; and
  23.    April 13, 2012: Jesse Gross.

failure to properly train Assistant D.A. Michael Rakaczewski and Monroe County Detective Wendy Bentzoni.

Now, on April 17, 2012, more than 26 months after the case was filed, and after discovery is finished, the plaintiffs move to amend their complaint (Doc. 55 ) to add Christine as a defendant and add "failure to train claims" which have not been at issue during the past two years of discovery.

## II.   Facts

Two high school-age girls in Monroe County reported to the Pocono Mt. Regional Police Department that they were gang-raped[3] by the plaintiffs on February 9, 2008.  One girl reported to the police that the five plaintiffs climbed on top of her and had vaginal sex with her against her will and also raped her anally.

The second girl reported that the plaintiffs forced her to have only oral sex with them because she was having her period.

---

[3] As used here, "Gang rape" occurs when a group of people participate in the rape of a single victim. http://en.wikipedia.org/wiki/Types_of_rape#Gang_rape. Plaintiffs allege inaccurately and without basis in fact, that "gang rape" refers to black men raping white women, improperly suggesting that the plaintiffs were targeted because of their race, 4 of which were black and 1 of which was white.

4

The police sent the girl who was vaginally and anally raped to Dr. Andrea Taroli, a physician Board Certified in Child Abuse Pediatrics and a regional expert in child abuse rape. Dr. Taroli reported to the police that the girl had such serious vaginal injuries that she was unable to complete a physical exam because it was too painful for the child victim:

> ” 29:17  In general, she had two linear
> 29:18   bruises on her back below the right scapula.  She
> 29:19   said that that was -- she said when she had been
> 29:20   sexually assaulted, she was on a futon.  And she
> 29:21   had a suction petechiae, commonly known as
> 29:22   hickey, on the right side of her neck.
> 29:23          Her genital exam was remarkable for
> 29:24   Tanner IV genital development, which is almost
> 29:25   complete sexual maturation of the genital
> 30:1   structures.  Her vulva, which is the complete
> 30:2   area including the labia majora and labia minora,
> 30:3   was swollen and red and tender to touch, to
> 30:4   palpation.  Again, the labia majora and minora
> 30:5   were red and swollen.  I was unable to perform
> 30:6   speculum exam or by manual exam, which is
> 30:7   inserting fingers into the vagina and palpating
> 30:8   the abdomen at the same time.  It was too painful
> 30:9   for me to be able to do that….
> ...
>
> 30:16          The posterior fourchette, which is
> 30:17   the area at the very bottom where the labia
> 30:18   minora and labia majora join posteriorly, was
> 30:19   abraded and had fissures which were still
> 30:20   bleeding with a little traction of the tissues.”

Dr. Taroli Deposition, at pp. 29-30 (Exhibit A).

5

The second girl, who claimed the plaintiffs forced her to perform oral sex on them, had semen stains on her T-Shirt linked to one of the plaintiffs.

In response to the girls representations, the serious vaginal injuries suffered by one of the girls, the semen stains on another girl's shirt linked to one of the defendants, and the advice provided by Dr. Taroli, an expert in the field they filed criminal charges against the 5 plaintiffs.

After the Police filed the charges and the plaintiffs were imprisoned while waiting for trial, the girl who suffered the serious vaginal injuries, said that she was not threatened with a knife as she previously represented and that one of the five plaintiffs did not penetrate her although he was complicit in the rape.

Assistant DA Rakaczewski, who was assigned to the prosecution, decided that because of the partial recantation, he could not obtain a conviction and that in the interests of justice, he asked the Court to dismiss the charges.

After the dismissal, plaintiffs sued claiming:

(a) the defendants should have known that the girls lied;

(b) that while they took turns having sex with these young girls, it was all consensual; and

(c) That the defendants should have understood that the serious injuries suffered by one of the girls was merely the expected consequence of them having serial sexual intercourse with her.

## III.    Issue Presented

Whether the Court should allow the plaintiffs to amend their complaint to add a new defendant and a new failure to train claim, after two years of discovery and after the statute of limitations has expired?

Suggested answer: no. Amendment should be denied because of the prejudice to the defendants, because the statute of limitations has passed, and because an amendment will require an additional extended period of discovery.

## IV.    Argument

The Court should deny the plaintiffs' request to amend their complaint to add a **new party** and **new claims** because of the prejudice to the defendants.

**First**, plaintiffs filed this case more than two years ago and they offer no proper explanation why they suddenly discovered new claims.

**Second**, the defendants participated in 23 depositions, produced hundreds of pages of discovery, and asked plaintiffs for discovery based on the representation that DA Christine was not a party and that Plaintiffs did not claim that DA Christine and the County failed to properly train ADA Rakaczewski and County Detective Bentzoni. In fact, this Court dismissed all claims against DA Christine on July 26, 2010, before the parties even took any depositions.

If, "mid-stream", plaintiffs now want to add Christine as a defendant and now pursue training claims, which were not at issue, the defense may need to:

    a.  Re-depose parties and witnesses;

    b.  Take depositions of parties not yet deposed; and

    c.  Retain expert witnesses on training issues after they develop a factual record for the expert to evaluate.

**Third**, plaintiffs now want to pursue claims against DA Christine, individually, and the County more than 3 years after the plaintiffs' criminal cases were dismissed.

As the Court noted in its order dated July 26, 2010, plaintiffs never personally named Christine as a defendant but only in his official capacity. The Court dismissed those claims on that date:

> "Accordingly, the court will dismiss the claim against DA Christine, because it is brought against him in solely his official capacity, and duplicates the surviving claim against Monroe County."

Doc. 23 , at p. 19.

Adding Christine individually at this late date is barred by a two-year statute of limitations. Shaud v. Sugarloaf Twp. Supervisors, 2011 U.S. Dist. LEXIS 25229 (M.D. Pa. Mar. 11, 2011) (Munley, J.). To the extent the court grants an amendment, defendants desire to pursue another Rule 12 (b) (6) motion which the Court already granted in favor of Christine, in his official capacity, at the beginning of this case.

Essentially, plaintiffs now ask for a "do over" to add parties and claims never at issue. Rule 15 does not permit such a late amendment.

The applicable portion of Rule 15(a) states that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

In determining the propriety of an amendment, the Court may consider such facts as undue delay and prejudice to the opposing party. Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962). Yusef Enters. v. A.H. Meyers & Co., 1994 U.S. Dist. LEXIS 7063, 2-3 (E.D. Pa. May 23, 1994).

When deciding Rule 15 motions, Courts must balance their overriding interest in achieving a decision on the merits against the potential for prejudice or unfair disadvantage to a nonmoving party caused by an amendment.

In Foman v. Davis, 371 U.S. 178, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962), the Supreme Court identified the factors courts could consider in denying a party leave to amend. Among these factors, two are relevant to the consideration of defendant's motion: "undue delay" and "undue prejudice to the opposing party by virtue of allowance of the amendment." Id. at 182. Butcher & Singer, Inc. v. Kellam, 105 F.R.D. 450, 452 (D. Del. 1984)

Thus, in Yusef Enters, the Court denied the plaintiff's motion to amend because the case was in the Court's trial pool and the new allegations would require additional discovery. The Court noted:

10

"This is not the proper time for Plaintiff to emerge with new legal theories." Id., at *3.

In Agostino Ferrari, S.p.A. v. Antonacci, 858 F. Supp. 478, 480 (E.D. Pa. 1994)), a court denied a plaintiff's motion to amend in part because allowing plaintiffs to amend could require reopening discovery and would necessitate issuance of a new case management schedule to permit defendants to file a summary judgment motion on the amended claim.

In Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004), the 3rd Circuit noted that if, by allowing the amendment, it would require the parties and the court to expend significant additional resources to prepare for and defend the late-arriving claim, then this is the type of prejudice that would justify the denial of amendment.

The defense notes that failure to train claims are typical in §1983 claims. The omission of such a claim was significant and affected the defense's case strategy and approach to handling all of the discovery taken during the past two years. The plaintiffs' attorney was well aware of the claim and chose not to pursue it. Adding parties and claims at this point are barred by the statute of limitations and would require a significant extension of the case management deadlines to avoid

prejudice to the defense. This is simply not appropriate after the court already warned the parties in August 2011 that there would be no further extensions.

WHEREFORE, the defendants, Monroe County, Michael Rakaczewski, and Wendy Bentzoni request that the Court deny the plaintiffs' motion to amend.

**NEWMAN, WILLIAMS, MISHKIN, CORVELEYN, WOLFE & FARERI, P.C.**

By: /s/ Gerard J. Geiger, Esq.
      Attorney I.D. No. 44099

Date: April 23, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the parties' attorneys were served with a copy of the foregoing document via ECF.

**NEWMAN, WILLIAMS, MISHKIN,**
**CORVELEYN, WOLFE & FARERI, P.C.**

By: /s/ Gerard J. Geiger, Esq.
    Attorney I.D. No. 44099

Date: April 23, 2012

Page 29

1    A    Yes.

2    Q    -- if you believed that to be the

3    case?

4    A    Absolutely.

5    Q    Did you make any assessment one way

6    or the other -- obviously, nobody can really tell

7    whether someone is telling the truth; but did you

8    have an impression one way or the other as to

9    whether this young woman was being credible?

10    A    Yes.  In my estimation, based on my

11    education, training, and experience, she was very

12    credible.

13    Q    Okay.  Can you indicate, Doctor, for

14    the benefit of the record and based upon your

15    report what your physical examination entailed

16    and what your findings were?

17    A    In general, she had two linear

18    bruises on her back below the right scapula.  She

19    said that that was -- she said when she had been

20    sexually assaulted, she was on a futon.  And she

21    had a suction petechiae, commonly known as

22    hickey, on the right side of her neck.

23        Her genital exam was remarkable for

24    Tanner IV genital development, which is almost

25    complete sexual maturation of the genital

Page 30

1    structures.  Her vulva, which is the complete

2    area including the labia majora and labia minora,

3    was swollen and red and tender to touch, to

4    palpation.  Again, the labia majora and minora

5    were red and swollen.  I was unable to perform

6    speculum exam or by manual exam, which is

7    inserting fingers into the vagina and palpating

8    the abdomen at the same time.  It was too painful

9    for me to be able to do that.

10        Examination of her hymen showed that

11    it was estrogenized, as you would expect with her

12    level of puberty and development; fimbriated,

13    which is just a description of its redundancy and

14    physical appearance.  It had no transections,

15    which is no lacerations or tears.

16        The posterior fourchette, which is

17    the area at the very bottom where the labia

18    minora and labia majora join posteriorly, was

19    abraded and had fissures which were still

20    bleeding with a little traction of the tissues.

21        There was a very small amount of

22    white fibronous healing tissue that was beginning

23    in the abrasions, which was easily removed with a

24    cotton swab.

25        Her anal tone was normal.  The skin

Page 31

1    folds, or rugae, around the anus were symmetric.

2    There were no lacerations or lesions or injuries

3    of the perianal skin.

4    Q    Doctor, with respect to those -- and

5    maybe we'll go from the most recent finding and

6    move backward a little bit.  There's been quite a

7    bit of emphasis in this case placed upon the fact

8    that Autumn had made allegations of being

9    sodomized and that her -- the findings of her --

10    of her anus, rectum were normal.

11        Are those findings of a -- of a

12    normal anal exam inconsistent with the child's

13    allegation that she was sodomized?

14    A    No.  Actually, that would be

15    expected.  The vast majority of cases of anal

16    penetration, whether it's consensual or against

17    consent, even in very young children, the anal

18    exam is normal.  On occasion, you'll see some

19    very small fissures which heal within a day or

20    two; but for the most part, the exam is normal.

21        The anus is a structure that is

22    designed to dilate, to expand to allow the

23    passage of stool, which can be rather large at

24    times, without any kind of injuries.  So fingers,

25    penises can -- can be inserted into the anus

Page 32

1    without any kind of injury whatsoever in the vast

2    majority of cases.

3    Q    Okay.  Is that particular

4    explanation that you have just provided to me, is

5    that something that you've shared with law

6    enforcement officers over the years?

7    A    Yes.

8    Q    Detective Luthcke, at least for one,

9    I'll represent to you had indicated that -- that

10    that's -- not necessarily associated with this

11    particular case, but that's information that you

12    had provided to him at some point in time.

13        Would that be consistent with your

14    recollection?

15    A    Yes.  I -- I teach very extensively

16    to individuals in multiple disciplines.  And

17    that's -- that's something that I, you know, have

18    taught in routine regular courses on child sexual

19    abuse evaluations.

20    Q    Okay.  Doctor, based upon your

21    evaluation -- your general evaluation of Autumn,

22    were you satisfied that she had had sexual --

23    that she had had intercourse consistent with the

24    history that she had related having occurred on

25    February 9, 2008?

Exhibit "A"