# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM SPIESS; KASHEEN THOMAS; GENE THOMAS, II; JALEEL HOLDEN and JOSE LACEN, | : : : : : | No. 3:10cv287 (Judge Munley) |
| **Plaintiffs** | : | |
| v. | : : | |
| POCONO MOUNTAIN REGIONAL POLICE DEPARTMENT; TOBYHANNA TOWNSHIP; MOUNT POCONO BOROUGH; TUNKHANNOCK TOWNSHIP; COOLBAUGH TOWNSHIP; CHIEF HARRY W. LEWIS; RICHARD W. LUTHCKE; JOHN P. BOHRMAN; LUCAS BRAY; CHRIS WAGNER; MONROE COUNTY; A.D.A. MICHAEL RAKACZEWSKI; DET. WENDY BENTZONI and POCONO MOUNTAIN REGIONAL POLICE COMMISSION, | : : : : : : : : : : : : : : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court are seven (7) motions for summary judgment filed by all defendants in this civil rights action involving the plaintiffs' arrests for rape. (Docs. 69, 70, 74, 76, 78, 80 & 82). The motions have been fully briefed and are ripe for disposition. For the following reasons, defendants' motions for summary judgment will be granted in part and denied in part.

**BACKGROUND**

This civil rights lawsuit arises from the arrest and incarceration pending trial of Plaintiffs William Spiess ("Spiess"), Kasheen Thomas, Gene Thomas, II, Jaleel Holden ("Holden") and Jose Lacen ("Lacen") for the alleged sexual assault of two girls–sixteen year old AJ and fifteen year old TM–on the night of February 9, 2008.[1] (Doc. 63, Am. Compl. (hereinafter "Am. Compl.") ¶ 1). Spiess alleges that he did not engage in any sexual acts with either girl. (Doc. 71-22, Ex. U, Tr. of William Spiess Recorded Statement at 20; Doc. 71-20, Ex. S, Dep. of William Spiess (hereinafter "Spiess Dep.") at 54). The remaining plaintiffs state they engaged only in consensual sexual acts with the two girls. (Doc. 110, Pls.' Resp. to Monroe County Statement of Material Facts ¶ 14).

The court recognizes the sensitive and intimately personal nature of sexual assault cases. Because we find it necessary to intelligently discuss the present case, a graphic description of events is, unfortunately, required.

On the morning of February 11, 2008, the two girls went to the Pocono Mountain Regional Police Department ("PMRPD"). (Doc. 71-1,

---

[1] The court will refer to these minor individuals only by their initials. See Local Rule 5.2(d)(2); FEDERAL RULE OF CIVIL PROCEDURE 5.2.

Ex. A, PMRPD Incident Report dated Feb. 10, 2008 (hereinafter "Incident Report") at 5-30, 32-61).  The young women asserted that they were sexually assaulted on February 9, 2008.  (Id.)  The alleged victims were interviewed separately and gave conflicting stories regarding what had occurred on February 9, 2008.  (Id.)  The girls' statements differed in many different ways.

Subsequent to obtaining AJ's statement, Defendant PMRPD Detective Richard Luthcke ("Detective Luthcke") and Defendant Monroe County Detective Wendy Bentzoni ("Detective Bentzoni") transported AJ to the Pegasus Child Advocacy Center in Carbondale, Pennsylvania. (Incident Report at 61).  At approximately 11:00 a.m., Dr. Andi Taroli, Medical Director of the Pegasus Comprehensive Assessment Center, performed a forensic interview and examination of AJ.  (Id.)  Dr. Taroli concluded that AJ was a sexual assault victim.  (Doc. 81, Luthcke Statement of Material Facts ¶ 47).

Between 10:30 a.m. and 12:00 noon. Detective Luthcke called his supervisor, Defendant PMRPD Detective Chris Wagner ("Detective Wagner"), advising him of a current investigation involving the rape of two minors by multiple suspects.  (Id. at 98; Doc. 72, Wagner Statement of

3

Material Facts ¶ 11).  Detective Wagner advised Detective Luthcke he would assist when he arrived at the office.  (Incident Report at 98).  Upon arrival, Detective Wagner requested to speak with minor AJ.  (Id.) Detectives Luthcke and Wagner then spoke with AJ in the common interview room at PMRPD Headquarters.  (Id.)  This interview was not recorded.

At approximately 4:45 p.m., Detectives Luthcke and Wagner drove to Spiess' residence.  (Id. at 61, 98).  Spiess' mother answered the door and stated she had been waiting all day for the officers to arrive because TM's family had approached Spiess and her husband earlier in the day about a party where AJ and TM were sexually assaulted.  (Id. at 61). Spiess' mother then handed Detectives Luthcke and Wagner a note in TM's handwriting stating Spiess did not do anything wrong on the night of February 9, 2008.  (Id.)  Detectives Luthcke and Wagner were unable to speak with Spiess because he was not home.  (Id.)  But, Spiess' mother made arrangements to bring him to PMRPD Headquarters.  (Id.)

Around 6:15 p.m., Spiess arrived at PMRPD Headquarters and was interviewed by Defendants Detective Luthcke and PMRPD Detective Lucas Bray ("Detective Bray").  (Id. at 62, 98).  The interview was taped

and initially concluded at 7:15 p.m.  (Incident Report at 92).  The tape was turned back on, however, and Spiess continued to speak until 7:17 p.m. (Id.)  The tape was turned off from 7:17 p.m. to 7:26 p.m.  At 7:26 p.m., Spiess continued speaking with the detectives.  (Id. at 93).  The record does not accurately reflect what time the tape was finally stopped.  (Id. at 97).  But, Spiess' additional statement consisted of four (4) pages within the incident report.  (Id. at 93-97).

Subsequent to Spiess' interview, Detective Bray assisted Detective Luthcke with the completion of an arrest warrant for Lacen.  (Id. at 101). After completing the arrest warrant for Lacen, Detectives Wagner and Bray were able to confirm the alleged sexual assaults took place at 5008 Trafalgar Road, Mount Pocono, Pennsylvania.  (Id.)

Detective Wagner returned to PMRPD Headquarters and reviewed the search warrant and affidavit of probable cause prepared by Detective Luthcke.  (Id. at 99).  Subsequent to reviewing the affidavit of probable cause, Detective Wagner spoke with Defendant Monroe County Assistant District Attorney Michael Rakaczewski ("ADA Rakaczewski").  (Id.) Detective Wagner requested a nighttime search warrant out of concern that evidence might be destroyed.  (Id.)  After speaking with ADA

Rakaczewski, Detective Luthcke faxed the search and arrest warrant applications to ADA Rakaczewski. (Id. at 97, 99). ADA Rakaczewski approved the warrants and they were forwarded to District Judge Anzini for approval. (Id.) District Judge Anzini approved the search and arrest warrants at 11:30 p.m. (Id.)

Simultaneous with Detective Luthcke's actions to obtain the search and arrest warrants, Detectives Lenning, Bentzoni, Bray, Bohrman, Wagner and Officer Dunlap drove to 5008 Trafalgar Road–Lacen's residence. (Id. at 99). Shortly after arriving, Detective Lutchke advised the officers that the search and arrest warrants had been approved. (Id.) The detectives then executed the search warrant and Detective Bray arrested Lacen at approximately 11:40 p.m. on February 11, 2008. (Id. at 2-4, 99, 101).

Spiess, Kasheen Thomas and Gene Thomas II, were arrested on February 25, 2008. (Id. at 2-4). Holden was arrested on March 24, 2008. (Id.) The plaintiffs were charged with multiple felony counts of rape by forcible compulsion, conspiracy to commit rape, involuntary deviate sexual intercourse by forcible compulsion, sexual assault, aggravated indecent assault and indecent assault. (Id.) Three (3) of the five (5) plaintiffs,

although juveniles, were charged as adults because AJ stated a knife was used during the assault.

Prior to making the allegations of rape in February 2008, AJ had made two previous complaints of sexual molestation against a family member to PMRPD.  The complaints were made in the spring of 2006 and October 2007 and were investigated by the Monroe County District Attorney's Office, PMRPD and Monroe County Children and Youth (Doc 63-4, Ex. D Apr. 21, 2006 incident report; Doc. 63-5, Ex. E, Oct. 31, 2007 incident report (hereinafter "Oct. 2007 incident report")).  In both cases, AJ's allegations were recanted or closed as unfounded after detectives interviewed AJ and her family.  (Id.)  Specifically, on December 3, 2007, Monroe County Children and Youth closed the second abuse allegation as being unfounded and notified Detective Bohrman.  (Oct. 2007 incident report at 18).  Detective Bohrman closed his case and forwarded the file on the second abuse allegation to ADA Rakaczewski.  (Id.)  ADA Rakaczewski declined to prosecute the family member.  (Doc. 111-12, Ex. H, Dep. of Michael Rakaczewski (hereinafter "Rakaczewski Dep.") at 52-53).

Following a preliminary hearing on March 28, 2008, in which AJ and

TM testified and identified the plaintiffs as their assailants, plaintiffs were bound over for trial and incarcerated for nearly a year. In January 2009, the Monroe County DA's office received a letter from AJ's school. The letter reported AJ had confessed to providing false statements to police and false testimony to the court. In relevant part, the letter stated:

1.  AJ knew "she was going to engage in sexual activities at the boys' house."

2.  AJ knew "other males were going to be there as well."

3.  AJ admitted "she may have gone into another room and it got a little out of control and that she didn't leave because one of the boys told her if she did not continue he would not be her boyfriend anymore."

4.  At the time, AJ "thought she needed a boyfriend so she continued engaging in sexual activity."

5.  AJ admitted everything that had been previously stated about "a knife being held to her throat was untrue. There wasn't any knife."

(Doc. 111-11, Ex. G, AJ Pass Program Statement dated Jan. 6, 2009).

Subsequent to receiving the letter, Detective Luthcke and ADA Rakaczewski reinterviewed AJ on January 13, 2009. (Rakaczewski Dep

at 23).  AJ denied telling her school that she made false statements to the police.  (Id.)

On January 20, 2009, however, ADA Rakaczewski and Detective Bentzoni reinterviewed AJ for a second time.  (Id.)  AJ admitted lying about three things.  First, AJ admitted Spiess did not assault anyone.  (Id.)  Second, AJ lied about the presence of alcohol.  (Id.)  Finally, AJ lied about the presence of a knife.  (Id.)  As a result, on February 3, 2009, ADA Rakaczewski filed a nolle prosequi petition that effectively dropped all charges against plaintiffs.  (Doc. 71-18, Ex. Q, Pet. to Nolle Prosequi).  ADA Rakaczewski also concurred on plaintiffs' subsequent expungement petitions.  (Doc. 111-19, Ex. L, William Spiess Expungement Pet. and Order).

The plaintiffs filed a section 1983 complaint on February 8, 2010 alleging the defendants violated their civil rights.  (Doc. 1, Compl.).  After some motions and court orders, the plaintiffs' filed a nine-count amended complaint on June 7, 2012.  (Doc. 63).  Count I alleges false arrest and false imprisonment against the individual defendants.  In Count II, plaintiffs' assert a false arrest claim against ADA Rakaczewski in his investigative capacity.  Count III was omitted.  Count IV charges the

individual defendants with malicious prosecution.  Counts V - VII were omitted.  Count VIII alleges a failure to train and supervise claim against Tobyhanna Township, Mount Pocono Borough, Tunkhannock Township and Coolbaugh Township (collectively "municipalities"), Pocono Mountain Regional Police Commission (hereinafter "commission"), PMRPD and Chief Lewis.  In Count IX, plaintiffs assert a failure to train and supervise claim against Monroe County.

The defendants answered the amended complaint on June 26, 2012. (Docs. 64, 65).  At the conclusion of discovery, the defendants filed the instant motions for summary judgment (Docs. 69, 70, 74, 76, 78, 80 & 82) bringing the case to its present posture.

**JURISDICTION**

The court has federal question jurisdiction over this civil rights action brought under 42 U.S.C. § 1983.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. §§ 1343(a)(3), (4) (granting district courts jurisdiction over civil actions brought to redress deprivations of constitutional or statutory rights by way of damages or equitable relief).

**LEGAL STANDARD**

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden

of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

**DISCUSSION**

In the present case, the defendants are separated into three groups: (1) PMRPD Detectives Bohrman, Bray, Luthcke, Wagner and Monroe County Detective Bentzoni (collectively "individual defendants") who are sued for unlawful arrest, false imprisonment and malicious prosecution; (2) ADA Rakaczewski, in his individual investigative capacity as an assistant district attorney, who is sued for false arrest; and (3) Chief Lewis, PMRPD, the municipalities, the commission, and Monroe County (collectively "the municipal defendants") who are sued for failure to train and supervise.

The defendants have filed seven motions for summary judgment. (Docs. 69, 70, 74, 76, 78, 80, 82). Collectively, they seek summary judgment on all counts within plaintiffs' complaint. Because the individual motions for summary judgment contain similar legal issues, the court will address them as follows: 1) Individual defendants' substantive claims; 2) ADA Rakaczewski's substantive claims; 3) Immunity issues including absolute immunity and qualified immunity; and 4) The municipal defendants' substantive claims.

First, the court notes plaintiffs bring their federal law claims against all defendants pursuant to 42 U.S.C. § 1983 ("section 1983"). Section 1983 does not, by its own terms, create substantive rights. Rather, it provides remedies for deprivations of rights established elsewhere in the Constitution or federal law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

13

42 U.S.C. § 1983.  Thus, to establish a claim under Section 1983, two criteria must be met.  First, the conduct complained of must have been committed by a person acting under color of state law.  <u>Sameric Corp. of Del., Inc. v. City of Phila.</u>, 142 F.3d 582, 590 (3d Cir. 1998).  Second, the conduct must deprive the plaintiff of rights secured under the Constitution or federal law.  <u>Id.</u>

## A. Individual Defendants

Count I of the amended complaint alleges causes of action of false arrest and false imprisonment against the individual defendants.  The individual defendants move for summary judgment on both causes of action.  We will discuss them separately.

### 1. False Arrest

A claim for false arrest under section 1983 originates from the Fourth Amendment's guarantee against unreasonable seizures.  To state a Fourth Amendment claim for false arrest, a plaintiff must establish: (1) there was an arrest; and (2) the arrest was made without probable cause.  <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988).  Although no precise definition for probable cause exists, the Supreme Court has explained that police officers possess sufficient probable cause when (1)

there is a reasonable ground for belief of guilt determined from the totality of the circumstances, and (2) the belief of guilt is particularized with respect to the individual searched or seized.  Maryland v. Pringle, 540 U.S. 366, 371 (2003); see also Orsatti v. N.J. State Police, 71 F.3d at 483 (finding probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that the offense has been or is being committed by the person to be arrested.).

As a general principle, the complaining witness's statement and positive identification of the suspect is sufficient to support probable cause; however, this precept is not absolute, and independent exculpatory evidence or evidence of the victim's unreliability can serve to negate probable cause.  See Wilson v. Russo, 212 F.3d 781, 790 (3d Cir. 200). Additionally, the question of probable cause in a section 1983 damage suit is one for the jury, "particularly . . . where the probable cause determination rests on credibility conflicts."  Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 788 (3d Cir. 2000)).  Finally, when false arrest is at issue, "probable cause need only exist as to one of the offenses that could

be charged under the circumstances." Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994).

The individual defendants contend the affidavits of probable cause for all plaintiffs are "identical in all material respects." (Doc. 92, Wagner Br. in Supp. at 9, Doc. 93, Bohrman Br. in Supp. at 10, Doc. 94, Bray Br. in Supp. at 9, Doc. 95, Luthcke Br. in Supp. at 10, Doc. 96, Lewis Br. in Supp. at 10). As such, the individual defendants rely upon the affidavit of probable cause supporting the arrest of Lacen to substantiate the arrests of all plaintiffs.

The Lacen affidavit and incident report reveal plaintiffs were charged with multiple felony counts of rape by forcible compulsion, conspiracy to commit rape, involuntary deviate sexual intercourse by forcible compulsion, sexual assault, aggravated indecent assault and indecent assault. (Doc. 95-1, Ex. A, Lacen Aff. of Probable Cause at 2-6; Incident Report at 2-4).

The individual defendants focus their arguments on the assertion they had probable cause to arrest plaintiffs. Specifically, the individual defendants claim the victims provided first hand accounts of the sexual assaults. Additionally, plaintiffs, with the exception of Spiess, admit to

16

sexual activity with one or both of their accusers.  Finally, Dr. Taroli, a board certified pediatrician specializing in child abuse, diagnosed AJ as a victim of sexual assault.  Plaintiffs contend the individual defendants lacked probable cause because the Lacen affidavit contains material falsehoods and misrepresentations.

An arrest warrant "does not, in itself, shelter an officer from liability for false arrest."  Wilson, 212 F.3d at 786. Instead,

> a plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause.

Id. at 786-87 (internal quotations omitted).  Thus, we apply a two-part test when a party claims that an arrest pursuant to a warrant lacked probable cause.  This test helps ensure that a police officer does not "make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence."  Id.  The effort to determine whether "an affidavit is false or misleading must be undertaken with scrupulous neutrality."   Reedy v. Evanson, 615 F.3d 197, 214 n.24 (3d Cir. 2010).

17

As such, the plaintiffs must prove, by a preponderance of the evidence, that the individual defendants: (1) made assertions or omissions with a reckless disregard for the truth and (2) the statements or omissions are material, or necessary, to the finding of probable cause. We address the issues in turn.

**a. Assertions or Omissions Made With a Reckless Disregard For The Truth**

Plaintiffs must first establish the individual defendants made false assertions or omissions either deliberately or with a reckless disregard for the truth. Assertions are made with reckless disregard for the truth when, "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." Reedy, 615 F.3d at 213 (citations omitted). Assertions can be made with reckless disregard for the truth "even if they involve minor details—recklessness is measured not by the relevance of the information, but the demonstration of willingness to affirmatively distort truth." Id. Omissions are made with reckless disregard for the truth when "an officer recklessly omits facts that any reasonable person would know that a judge would want to know" in making a probable cause determination. Id.

### i. Assertions

Plaintiffs contend the individual defendants demonstrated a willingness to affirmatively distort the truth by failing to reconcile material inconsistencies within AJ and TM's statements prior to Lacen's arrest. The girls' statements differed as follows:

1.  AJ stated that the girls snuck out from her grandmother's house because TM wanted to see her boyfriend, Lacen. (Doc. 71-10, Ex. J, Aff. of A.J. (hereinafter "A.J. Aff.") at 9). TM stated they snuck out because Lacen and Spiess threatened to harm AJ's grandmother. (Doc. 71-11, Ex. K, Aff. of T.M. (hereinafter "T.M. Aff.") at 7-8).

2.  AJ stated they stopped at the Acorn gas station en route to Lacen's house. (AJ Aff. at 24-25). TM stated they went directly from the Shop Rite parking lot to the Lacen residence. (TM Aff. at 11).

3.  AJ told police that the boys were smoking marijuana from a "bong" in the vehicle when they picked the girls up at Shop Rite. (AJ Aff. at 11). AJ also stated that TM voluntarily smoked marijuana at Lacen's residence. (Id. at 28). TM stated she was forced to smoke marijuana at Lacen's residence and mentions nothing about Lacen and Spiess smoking marijuana from a bong in Spiess' car. (TM Aff. at 12-15, 23-24).

4.      AJ told police that inside the house people were drinking vodka and light beer.  (AJ Aff. at 38).  TM stated that no alcohol was consumed in the home and she never saw any bottles of alcohol.  (TM Aff. at 33).

5.      AJ accused Spiess of undressing and raping her.  (AJ Aff. at 28). TM stated that Spiess sat and watched, but did not touch either girl.  (TM Aff. at 8, 22-23).

6.      AJ told police that she was taken into a separate bedroom from TM where several boys sexually assaulted her.  (AJ Aff. at 28, 32).  TM stated that she and AJ were in the same room during the entire incident.  (TM Aff. at 8, 13, 20-23, 34).

7.      AJ named the plaintiffs and five other youths– "[JJ], [MM], a second Billy, Marcus, and [JC]"–  as being among her attackers.  (AJ Aff. at 13-24).  AJ stated that everyone at Lacen's residence, except for Marcus, raped her.  (AJ Aff. at 28-29, 34).  TM told police, in four different ways, that the only person who had sex with AJ was Lacen.  TM stated Lacen: (1) "raped AJ"; (2) "stuck it in AJ"; (3) "had sex with AJ"; or (4) "had sexual intercourse with AJ."  (TM Aff. at 8, 13, 20-23).

8.      AJ stated a boy named Marcus drove them home in Spiess' red truck and that Marcus had been at Lacen's residence the entire night.  (AJ

Aff. at 30, 37). TM stated that the person who drove them home arrived afterwards and drove a black car. (TM Aff. at 26-27).

9.     AJ stated that a knife was held to her throat during the assaults. (AJ Aff. at 35-36). TM stated that no knives or other weapons were used. (TM Aff. at 33).

The court agrees with plaintiffs that the individual defendants failure to reconcile the girls' inconsistent statements raises a genuine issue of material fact with regard to whether they acted with a reckless disregard for the truth. Here, the individual defendants conducted a sixteen (16) hour investigation on February 11, 2008. AJ and TM were interviewed by 12:30 p.m. giving the individual defendants almost eleven (11) hours to reconcile the inconsistencies before Lacen was arrested at 11:30 p.m. Furthermore, the individual defendants discussed the girls' statements and the importance of reconciling the statements to make sure AJ and TM were telling the truth. (Doc. 71-3, Ex. C, Dep. of Richard Luthcke (hereinafter "Luthcke Dep.") at 33, 35-36, 100-01; Doc. 71-2, Ex. B, Dep. of Chris Wagner (hereinafter "Wagner Dep.") at 24-25; ). But, the individual defendants failed to follow-up and vet the inconsistencies.

For example, AJ stated a knife was held to her throat during the assaults. TM, who stated that she was in the same room as AJ, told police that no knives or other weapons were used. The individual defendants knew or should have known that the presence and alleged use of a dangerous weapon was needed not only to satisfy elements of the underlying crimes, but also was the only aggravating factor that certified the three (3) juvenile plaintiffs into adult court. In other words, the alleged presence of the knife removed the three juvenile plaintiffs from the juvenile rehabilitative system and into the adult specific and general deterrence system. Even Detective Luthcke admitted this was a glaring and significant discrepancy. (Luthcke Dep. at 53, 66-67). Also, Detective Wagner, the supervisor in charge of the investigation, conceded the contradictory statements about the knife were significant and all the more reason to reinterview the girls. (Wagner Dep. at 18-19).

Moreover, if the individual defendants truly believed a knife was used by plaintiffs, it might be concluded that they would have listed the knife among the items they were looking for in the search warrant application. The individual defendants admitted they did not include the knife in the search warrant application. (Luthcke Dep. at 31). In fact, the

individual defendants admitted they never looked for or found a knife during the search of Lacen's residence.  (Id.)

Simply put, the individual defendants were aware of glaring inconsistencies, had the time and opportunity to reconcile the statements but chose not to act.  Accordingly, the individual defendants failure to reconcile the statements may demonstrate a willingness to affirmatively distort the truth.

### ii.  Omissions

Plaintiffs also contend the individual defendants omitted material facts from the affidavits of probable cause that any reasonable person would want a judge to know.  Plaintiffs argue several facts were omitted with a reckless disregard for the truth.  We find, however, one key omission relevant to our probable cause analysis: AJ's recent history of reporting unfounded rape allegations.

Plaintiffs argue the individual defendants and ADA Rakaczewski were aware AJ had a history of reporting unfounded rape allegations, but failed to reinterview AJ and vet her inconsistent statements.  The unfounded allegations were made in spring 2006 and October 2007 and were investigated by the Monroe County District Attorney's Office,

23

PMRPD and Monroe County Children and Youth. (Doc 63-4, Ex. D Apr. 21, 2006 incident report; Doc. 63-5, Ex. E, Oct. 31, 2007 incident report (hereinafter "Oct. 2007 incident report"). In both cases, AJ's allegations were recanted or closed as unfounded after detectives interviewed AJ and her family. (Id.)

Specifically, Detective Bohrman spoke with Monroe County Children and Youth caseworker Guinan two months before the events in this case. (Oct. 2007 incident report at 18). Ms. Guinan indicated that after interviewing all parties, Children and Youth was going to close their case as being unfounded. (Id.) Accordingly, Detective Bohrman closed his case and forwarded the file to ADA Rakaczewski. (Id.) ADA Rakaczewski declined to prosecute the family member. (Rakaczewski Dep. at 52-53). The individual defendants' failure to include the victim's recent history of reporting unfounded rape allegations may demonstrate a reckless disregard for the truth.

### b. Materiality

After sufficient evidence of assertions and omissions made with a reckless disregard for the truth, a court assesses whether the assertions or omissions made with reckless disregard of the truth were material, or

necessary, to the finding of probable cause." Reedy, 615 F.3d at 213 (citations omitted). "To determine the materiality of the misstatements and omissions," a court must "excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether the corrected affidavit would establish probable cause." Id. The corrected affidavit "simply becomes one more set of factual assertions that must be viewed in the light most favorable to the non-movant." Id. at 214 n.24.

Performing such editing on the affidavit of probable cause would produce an affidavit that reads:[2]

1.    On February 11, 2008, minors AJ and TM reported they were sexually assaulted on the late evening of February 9, 2008 into the early morning hours of February 10, 2008. AJ reported she was raped by numerous males. [TM told police, in four different ways, that the only person who had sex with AJ was Lacen. TM stated Lacen: (1) "raped AJ"; (2) "stuck it in AJ"; (3) "had sex with AJ"; or (4) "had sexual intercourse with AJ."]

---

[2]Changed or additional information appears in brackets.

2.      Around 11:30 p.m., AJ and TM received a phone call from Lacen [who AJ stated was TM's boyfriend] asking them to meet him at the Shop Rite in Mount Pocono.  AJ and TM went to that location [because TM wanted to see her boyfriend or because Lacen threatened AJ's grandmother] and were picked up by Lacen and another male they knew as "Billy" [Spiess.] Spiess was driving a red Ford SUV.

3.      While driving, Lacen and Spiess told AJ and TM that "they had a job to do" which referred to AJ having sex with them and TM performing oral sex on them.  [AJ stated they stopped at the Acorn gas station en route to Lacen's house.  TM stated they went directly from the Shop Rite parking lot to Lacen's residence.  Additionally, AJ said Lacen and Spiess were smoking marijuana from a bong inside Spiess' car.  TM stated they all smoked marijuana once they arrived at Lacen's residence.]

4.      AJ stated that there were numerous people at Lacen's residence and everyone was drinking vodka and light beer.  Additionally, everyone was smoking marijuana including TM who smoked marijuana voluntarily. [TM stated she was forced to smoke marijuana.  TM also stated she never saw any bottles of alcohol or alcohol being consumed.]

5.      AJ accused Spiess of undressing and raping her.  [TM stated Spiess sat and watched, but did not touch either girl.]

6.     AJ told police that she was taken into a separate bedroom from TM where several boys sexually assaulted her. [TM stated that she and AJ were in the same room during the entire incident.]

7.     AJ stated Lacen held a pocket knife to her throat during the assaults. [TM said she and AJ were in the same room during the entire incident and she did not observe any knives or weapons being used to threaten either girl.]

8.     TM was also interviewed. [TM told police she was in the same room as AJ while the sexual activity was occurring.]  TM stated that the only sexual activity she engaged in was performing oral sex on Lacen while two unidentified black males held her down.

9.     KA was interviewed.  He stated that he picked up both AJ and TM from Lacen's house on 2/10/2008 and drove them home.  KA identified Lacen's residence as 5008 Trafalgar Rd. Pocono Farms East.


        The individual defendants maintain even a reconstructed affidavit establishes probable cause to arrest Lacen.  In support of their position, the individual defendants rely upon Rodriguez v. Scranton Police Dept., No. 10-CV-2022, 2013 WL 74292, (M.D. Pa. Jan. 4, 2013).  In Rodriguez,

this court found that as "a general principal, the complaining witness's statement and positive identification of the suspect is sufficient to support probable cause. Id. at *7. We find Rodriguez distinguishable from the instant case.

In Rodriguez the alleged victim and sole witness to the alleged sexual assault provided police with two consistent statements. Id. at *8. Additionally, the record indicated the police had yet to find any exculpatory evidence after an investigation lasting nearly a month. Id. Moreover, in addition to the two consistent statements given to police, the alleged victim's statement at the preliminary hearing tracked closely to her prior statement. Id. As such, we held that "in the absence of exculpatory evidence or substantial evidence of [alleged victim's] unreliability," sufficient evidence existed to establish probable cause as a matter of law. Id. at 9.

The instant case is distinguishable. Here, the court has been presented with two alleged victims whose statements differed on multiple material facts. Additionally, the individual defendants were aware of AJ's unreliability based upon her unfounded rape accusations just three (3) months prior to this incident. The individual defendants, however, failed to

reinterview AJ and TM to reconcile their inconsistent statements.  Finally,

it is undisputed AJ and TM changed their testimony at the preliminary

hearing from the one and only statement each had given to police.  In fact,

AJ and TM changed their testimony at the preliminary hearing so much

that Defendant Luthcke candidly admitted he could have filed perjury

charges against the girls.  (Luthcke Dep. at 92-99).

As such, a reasonable jury could find by a preponderance of the

evidence that the assertions and omission are material to the finding of

probable cause.  Thus, viewing the reconstructed affidavit in a light most

favorable to plaintiffs, a genuine issue of disputed fact exists as to whether

there was probable cause at the time of Lacen's arrest.  Accordingly, the

individual defendants' motions for summary judgment on plaintiffs' false

arrest claims will be denied.

### 2. Plaintiffs' Section 1983 False Imprisonment Claims Against the Individual Defendants

The individual defendants next move for summary judgment on

plaintiffs' false imprisonment claims.  After careful review, we find granting

summary judgment is inappropriate.

"Where the police lack probable cause to make an arrest, the

arrestee has a claim under section 1983 for false imprisonment based

upon a detention pursuant to that arrest." Groman v. Manalapan, 47 F.3d

628, 636 (3d Cir. 1995). Here, plaintiffs were all detained pursuant to their

arrest. Also, a genuine issue of disputed fact exists pertaining to the

probable cause for plaintiffs' arrests. As such, the individual defendants'

motions for summary judgment on plaintiffs' false imprisonment claims will

be denied.

**3. Plaintiffs' Section 1983 Malicious Prosecution Claims against the Individual Defendants**

Plaintiffs assert a malicious prosecution claim against the individual

defendants. To prevail in a Section 1983 malicious prosecution action,

plaintiffs must show that:

> (1) the defendants initiated a criminal proceeding;
> (2) the criminal proceeding ended in plaintiff's favor;
> (3) the proceeding was initiated without probable cause;
> (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and
> (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003); see also

Kossler v. Crisanti, 564 F.3d 181, 186 n.2 (3d Cir. 2009) (en banc).

Malicious prosecution differs from false arrest inasmuch as "[a] claim for

false arrest, unlike a claim for malicious prosecution, covers damages only

for the time of detention until the issuance of process or arraignment, and not more." Johnson v. Knorr, 477 F.3d 75, 82 (3d Cir. 2007) (quoting Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998)).  Here, plaintiffs and defendants agree the fifth element—deprivation of liberty—has been satisfied.  As such, we address the first four elements in turn.

### a. Individual Defendants Initiated the Criminal Proceeding

Prior to addressing the parties' arguments, the court notes that plaintiffs' malicious prosecution claim has been filed against the individual defendants: PMRPD Detectives Bohrman, Bray, Luthcke and Wagner as well as Monroe County Detective Bentzoni.  See (Am Compl. ¶¶ 28, 139-49).   We find, viewing all of the facts in the light most favorable to plaintiffs, Detective Bentzoni is entitled to judgment as a matter of law on plaintiffs' malicious prosecution claim.

In the present case, Detective Bentzoni was never in a position to file criminal charges.  The charges were going to be filed by the police detectives or ADA Rakaczewski.  Additionally, plaintiffs' malicious prosecution arguments focus on the actions of the police detectives and ADA Rakaczewski, not Detective Bentzoni.  Therefore, Detective Bentzoni

is entitled to summary judgment on plaintiffs' malicious prosecution claim.

We next determine whether the police detectives initiated the criminal proceeding. Generally, "it is the prosecutor, not the police officer, who is responsible for initiating a proceeding against a defendant," Gratter v. Zappile, 67 F. Supp. 2d 515, 521 (E.D. Pa. 1999). An officer, however, may be considered to have initiated the criminal proceeding if "he or she knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." Henderson v. City of Phila., 853 F. Supp. 2d 514, 518-19 (citations omitted).

Here, the police detectives and ADA Rakaczewski disagree as to who initiated the criminal proceeding. The police detectives contend ADA Rakaczewski approved the criminal charges thereby initiating the criminal proceeding. (Rakaczewski Dep. at 12). Rakaczewski claims the police detectives, not him, signed the affidavits of probable cause initiating the criminal prosecution. (Doc. 75, Def. Monroe Cnty. Statement of Material Facts ¶ 45). Accordingly, a genuine issue of material fact exists pertaining to who initiated the criminal proceeding.

### b.  The Criminal Proceeding Ended in Plaintiffs' Favor

The second element plaintiffs must establish to prevail on a malicious prosecution claim is that the criminal proceedings terminated in their favor. As the Third Circuit Court of Appeals has observed:

> [c]riminal proceedings are terminated in favor of the accused by:
> (a) a discharge by a magistrate at a preliminary hearing, or
> (b) the refusal of a grand jury to indict, or
> (c) the formal abandonment of the proceedings by the public prosecutor, or
> (d) the quashing of an indictment or information, or
> (e) an acquittal, or
> (f) a final order in favor of the accused by a trial or appellate court.

Donahue v. Gavin, 280 F.3d 371, 383 (3d Cir. 2002) (quoting Section 659 of the RESTATEMENT (SECOND) OF TORTS).  The Pennsylvania Supreme Court adopted § 659 in Haefner v. Burkey, 626 A.2d 519, 521 (Pa. 1993).

As noted above, in the instant case the criminal proceedings ended when ADA Rakaczewski filed a nolle prosequi petition.  The Third Circuit Court of Appeals has noted that while "a grant of nolle prosequi can be sufficient to satisfy the favorable termination requirement for malicious prosecution, not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably." Donahue v. Gavin, 280 F.3d 371, 383 (3d Cir. 2002) (quoting Hilfirty v. Shipman, 91 F.3d 573,

33

579-80 (3d Cir. 1996)).  A decision by the prosecutor to nolle prosequi criminal charges "signifies termination of charges in favor of the accused only when their final disposition is such as to indicate the innocence of the accused." <u>Donahue</u>, 280 F.3d 371, at 383 (citation omitted).  The court, however, may look beyond the order itself "to any other matter in the record . . . as to why the motion was filed or granted." <u>DiFronzo v. Chiovero</u>, 406 F. App'x 605, 609 (3d Cir. 2011).

Here, ADA Rakaczewski's petition to nolle prosequi plaintiffs' charges satisfies the favorable termination requirement as a matter of law.  ADA Rakaczewski's petition states, "[Based upon the Commonwealth's continued investigation, the **victims admitted testifying falsely under oath on a material matter**, **the matter lacks prosecutorial merit** and a nolle prosequi should be entered on these charges **in the interest of justice**." (Doc. 71-18, Ex. Q, Jose Lacen Pet. to Nolle Prosequi) (emphasis added).

ADA Rakaczewski did not dismiss the charges because of any plea agreement, change in law or some other reason unrelated to the weight of the evidence.  ADA Rakaczewski dismissed the charges because the victims lied, the matter lacked prosecutorial merit and the interests of

justice commanded dismissal.  Moreover, ADA Rakaczewski concurred on plaintiffs' expungement petitions further illustrating favorable termination. (Doc. 111-19, Ex. L, William Spiess Expungement Pet. and Order). Therefore, we find plaintiffs have satisfied the favorable termination requirement.

### c.  The Proceeding was Initiated Without Probable Cause

In addition to the first two elements of malicious prosecution, plaintiffs must also demonstrate the proceeding was initiated without probable cause.  Because the arguments for probable cause on plaintiffs' malicious prosecution claim mirror the arguments for plaintiffs' unlawful seizure and false arrest claims, the analysis provided above is equally applicable here.  Ergo, disputed issues of material fact exist regarding whether the proceeding was initiated without probable cause.

### d.  The Defendants Acted Maliciously or for a Purpose Other Than Bringing the Plaintiff to Justice

Finally, plaintiffs must prove defendants acted maliciously or for a purpose other than bringing the plaintiff to justice.  "Malice has been defined as ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, **or** its use for an extraneous improper purpose."  Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993)

(emphasis in original).  The Third Circuit Court of Appeals emphasized that "a police officer could have ill-will or spite against someone they never met–i.e., a member of a particular ethnic or racial group."  Id. at 1503. Finally, malice may be inferred from the absence of probable cause.  Id.

In the present case, plaintiffs have demonstrated genuine issues of material fact as to whether or not defendants acted maliciously.  Plaintiffs allege the charges against the plaintiffs, four (4) of whom were African American or Hispanic, were motivated by race and/or defendants' belief plaintiffs were members of dangerous street gangs.  Specifically, Spiess contends he was shown pictures of alleged gang members during his initial interview with police.  (Spiess Dep. at 17-18).  Additionally, Spiess contends the police detectives tried to get him, the only White plaintiff, to testify against the African American and Hispanic plaintiffs in exchange for the dismissal of the charges against him.  (Id.)  Moreover, Lacen testified the police detectives were calling him names and acting in a racist way towards him.  (Doc. 71-8, Ex. H, Dep. of Jose Lacen at 31).  Lacen also stated that Detective Luthcke falsely accused him of being a member of the Bloods street gang.  (Id. at 58-61).  Finally, Detective Bohrman admitted, albeit erroneously, that the events on the evening in question

were some sort of "gang initiation" by plaintiffs. (Doc. 71-5, Ex. E, Dep. of John Bohrman (hereinafter "Bohrman Dep.") at 39). Thus, we find that viewing all of the evidence in the light most favorable to plaintiffs, genuine issues of material fact exist as to whether or not the police detectives acted maliciously or for a purpose other than bringing the plaintiffs to justice.

In sum, we find plaintiffs have satisfied the favorable termination and deprivation of liberty elements. We further find genuine issues of material fact exist pertaining to the initiation, probable cause and malice elements. As such, the police detectives' motions for summary judgment on plaintiffs' malicious prosecution claim will be denied.

### B. Plaintiffs' Section 1983 False Arrest Claims Against ADA Rakaczewski

ADA Rakaczewski moves for summary judgment on plaintiffs' false arrest claim arguing he played no role in the investigation. Plaintiffs' cognizable federal claims against ADA Rakaczewski depend upon their assertion that ADA Rakaczewski conducted a constitutionally deficient investigation and therefore lacked probable cause in violation of the Fourth Amendment. Specifically, plaintiffs contend ADA Rakaczewski was present at the police station and was one of the individuals who made the

collective determination as to whether or not probable cause existed.  We find that summary judgment on this issue is inappropriate.

Discovery has revealed that ADA Rakaczewski fails to recall whether or not he was present during the investigation on the day in question. (Rakaczewski Dep. at 11-12).  The police detectives and chief of police, however, state Rakaczewski was present at PMRPD Headquarters on February 11, 2008, and that he was among the group that made the collective decision on probable cause.  (Wagner Dep. at 24-25; Luthcke Dep. at 100-01; Doc. 71-7, Ex. G, Dep. of Harry Lewis (hereinafter "Lewis Dep.") at 34-36; Rakaczewski Dep. at 11-12, 37-40).

Viewing the evidence in a light most favorable to plaintiffs, a genuine issue of disputed fact exists pertaining to what level of involvement ADA Rakaczewski had in the underlying investigation.  Accordingly, ADA Rakaczewski's motion for summary judgment on plaintiffs' false arrest claims will be denied.

### C. Immunity

The detectives and ADA Rakaczewski raise the issue of immunity. They argue both absolute and qualified immunity bar plaintiffs' claims.  As such, we will determine whether absolute or qualified immunity applies,

and if so, whether it precludes plaintiffs' claims.

### 1. Absolute Immunity

"Prosecutors are immune from suit under section 1983 for 'initiating and pursuing a criminal prosecution.'" Carter, 181 F.3d at 355 (quoting Imbler v. Pachtman, 424 U.S. 409, 430-31 (1976)). Immunity also extends to "'the preparation necessary to present a case,' and this includes the 'obtaining, reviewing, and evaluation of evidence.'" Kulwicki v. Dawson, 969 F.2d 1454, 1465 (3d Cir. 1992) (quoting Schrob v. Catterson, 948 F.2d 1402, 1414 (3d Cir. 1991)).

Not all actions of a prosecutor, however, are immunized. Instead, "prosecutors are subject to varying levels of official immunity" and absolute prosecutorial immunity attaches only to actions performed in a 'quasi-judicial' role", such as participation in court proceedings and other conduct "intimately associated with the judicial phases" of litigation. Giuffre v. Bissell, 31 F.3d 1241, 1251 (3d Cir.1994) (quoting Imbler, 424 U.S. at 430). "By contrast, a prosecutor acting in an investigative or administrative capacity is protected only by qualified immunity." Id. (citations omitted).

The Third Circuit Court of Appeals, in Giuffre, held that a prosecutor

does not enjoy absolute immunity for giving advice to police during an investigation leading up to a criminal proceeding. 31 F.3d at 1253. A rule of thumb for defining the investigative / prosecutorial divide is the filing of a complaint. See Kulwicki, 969 F.2d at 1465 (holding that "[e]vidence gleaned prior to the filing is deemed investigative," "directing evidence-gathering" by police is investigative, and "giving probable cause advice" to police is investigative). Finally, the mere fact that a prosecution is formally initiated does not mean that all investigatory acts preceding the filing of charges are entitled to immunity. Buckley v. Fitzsimmons, 509 U.S. 259, 276 (1993). We now turn to ADA Rakaczewski and Detective Bentzoni's absolute immunity claims.

### a. ADA Rakaczewski

ADA Rakaczewski contends his investigative acts were integral to the prosecution. ADA Rakaczewski's argument, however, is the same absolute immunity argument previously rejected by the court on his motion to dismiss. (See Doc. 23, Mem. and Order dated July 26, 2010). As we held on July 26, 2010:

> [T]he complaint plausibly alleges that ADA Rakaczewski's actions were akin to merely advising officers as to probable cause or directing the gathering of evidence in an investigative capacity. The actions alleged here, in light of

> the rough temporal guideline of <u>Kulwicki</u> and <u>Buckley</u>'s
> warning that an eventual filing of charges does not
> necessarily immunize all investigative actions, indicate that
> the pre-complaint gathering of evidence and evaluation of
> probable cause were investigative in nature and deserving
> only qualified immunity.

(<u>Id.</u>)  Ergo, we will deny ADA Rakaczewski's claim for absolute immunity.

### b. Detective Bentzoni

Detective Bentzoni also contends she is entitled to absolute immunity for her limited role in obtaining a search warrant for the Lacen home.  The plaintiffs respond that, like ADA Rakaczewski, Detective Bentzoni is being sued for her pre-arrest actions, which are investigative functions. Because Detective Bentzoni's absolute immunity argument mirrors ADA Rakaczewski's argument, the analysis given above is equally applicable here.  Therefore, the court finds absolute immunity does not bar plaintiffs' claims against Detective Bentzoni.

### 2.  Qualified Immunity

ADA Rakaczewski, Detective Bentzoni and the police detectives move for summary judgment on plaintiffs' claims arguing qualified immunity precludes liability.  The doctrine of qualified immunity insulates government officials who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The burden of establishing entitlement to qualified immunity is on the defendants. Id. at 808. The Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001). We ask: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. Id.; Kelly v. Borough of Carlisle, 622 F.3d 248, 253 (3d Cir. 2010). If the plaintiff fails to satisfy either prong, the defendant is entitled to judgment as a matter of law. See id. at 232. Because a violation of a constitutional right can be established by defendants' allegedly unlawful seizure of plaintiffs, we turn our attention to whether the right was clearly established.

A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Reedy, 615 F.3d at 224 (quoting Katz, 533 U.S. at 202). A defendant police officer "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant

should issue . . . ." <u>Reedy</u>, 615 F.3d at 224 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  A police officer fails to observe a right that was clearly established by submitting "an affidavit containing statements he knows to be false or would know are false if he had not recklessly disregarded the truth."  <u>Lippay</u>, 996 F.2d at 1504.

Furthermore, "the standard for granting or denying a motion for summary judgment does not change in the qualified immunity context." <u>Curley v. Klem</u>, 298 F.3d 271, 282 (3d Cir. 2002).  A court must determine whether the defendant should prevail as a matter of law when viewing the facts in the light most favorable to the plaintiffs.  <u>Id.</u>  Thus, while "it is for the court to decide whether an officer's conduct violated a clearly established constitutional right, we have also acknowledged that the existence of disputed, historical facts material to the objective reasonableness of an officer's conduct will give rise to a jury issue." <u>Curley</u>, 298 F.3d at 278 (citations omitted).  As such, we will determine whether ADA Rakaczewski, Detective Bentzoni and the police detectives may invoke qualified immunity as a defense to plaintiffs' claims.

### a.  ADA Rakaczewski

We first address ADA Rakaczewski's qualified immunity claim.  ADA

Rakaczewski's qualified immunity arguments are almost identical to his arguments for absolute immunity. Specifically, ADA Rakaczewski contends he was acting as a prosecutor and not an investigator during the investigation. Additionally, ADA Rakaczewski attempts to distance himself from the police detectives. He fails to recall whether or not he was physically present at PMRPD Headquarters during the investigation on February 11, 2008. (Rakaczewski Dep. at 11-12).

Plaintiffs contend based upon the depositions of the police detectives that ADA Rakaczewski was present at the police station and was one of the individuals who made the collective determination as to whether or not probable cause existed. (Wagner Dep. at 24-25; Luthcke Dep. at 100-01; Lewis Dep. at 34-36; Rakaczewski Dep. at 11-12, 37-40). As such, the existence of disputed historical facts material to the objective reasonableness of ADA Rakaczewski's conduct must be resolved by a jury. See Curley, 298 F.3d at 278. Thus, viewing the evidence in the light most favorable to plaintiffs, the court finds qualified immunity does not bar plaintiffs' claims against ADA Rakaczewski.

### b. Detective Bentzoni

Detective Bentzoni also seeks the protections of qualified immunity.

Detective Bentzoni argues her role was limited to that of a simple liaison between the DA's office and police detectives. Plaintiffs contend Detective Bentzoni was involved from the start of the investigation and acted with a reckless disregard for the truth by omitting material facts and inserting into the affidavits of probable cause only those facts which were allegedly incriminating to plaintiffs.

In the present case, we find Detective Bentzoni was intimately involved with the investigation. Bentzoni joined the investigation at its initial phase in the early morning of February 11, 2008, and continued working on the investigation for the entire day into the next morning. (Doc. 111-3, Ex. C, Dep. of Wendy Bentzoni Part I (hereinafter "Bentzoni Dep. I") at 25, 30). Specifically, Bentzoni was present in AJ's interview at PMRPD Headquarters. (Incident Report at 32). Bentzoni accompanied Detective Luthcke to AJ's forensic interview an examination performed by Dr. Taroli. (Bentzoni Dep. I at 31, Doc. 111-4, Ex. C, Dep. of Wendy Bentzoni Part II (hereinafter "Bentzoni Dep. II") at 15). Moreover, Bentzoni was among the detectives who collectively discussed all of the evidence to determine whether probable cause existed to arrest plaintiffs. (Bentzoni Dep I at 24-26).

Bentzoni claims she was not in a position to offer advice or assert her opinion because that was not her role. (Bentzoni Dep. I at 24, 32; Bentzoni Dep. II at 1-2). Viewing the facts in the light most favorable to plaintiffs, however, the objective reasonableness of Bentzoni's conduct is a disputed factual issue. See Curley, 298 F.3d at 278. As such, Bentzoni's intimate involvement in the investigation coupled with the disputed reasonableness of her conduct preclude Bentzoni from invoking qualified immunity.

### c. Police Detectives

Finally, the police detectives assert plaintiffs' constitutional rights were not clearly established because a reasonable officer in their position would not have known probable cause was lacking. Plaintiffs contend the police detectives acted with a reckless disregard for the truth by omitting material facts and inserting into the affidavits of probable cause only those facts which were allegedly incriminating to plaintiffs.

In support of their position, police detectives rely upon Kelly v. Borough of Carlisle, 622 F.3d 248 (3d Cir. 2010). In Kelly, the Third Circuit Court of Appeals found a police officer was presumptively entitled to qualified immunity when he relied in good faith on a prosecutor's legal

opinion that the arrest is warranted.  (Id. at 255-56).  The police detectives

contend they sought and obtained the advice from ADA Rakaczewski prior

to arresting plaintiffs.  As a result, they have satisfied the commands of

Kelly and are thus entitled to the shield of qualified immunity.

The instant case is distinguishable.  While the police detectives

correctly state that police officers are presumptively entitled to qualified

immunity when they rely in good faith on a prosecutor's opinion that the

arrest is warranted, they fail to address the next two sentences in Kelly

stating:

> That reliance must itself be objectively reasonable,
> however, because "a wave of the prosecutor's wand
> cannot magically transform an unreasonable probable
> cause determination into a reasonable one."  Accordingly,
> a plaintiff may rebut this presumption by showing that,
> under all the factual and legal circumstances surrounding
> the arrest, a reasonable officer would not have relied on
> the prosecutor's advice.

Kelly, 622 F.3d at 256 (quoting Cox v. Hainey, 391 F.3d 25, 34 (1st Cir.

2004)).  Here, the police detective's reliance on ADA Rakaczewski's

approval is unreasonable for two reasons.  First, the police detectives

were aware of the inconsistencies within the girls' statements.  Thus, the

wave of ADA Rakaczewski's prosecutorial wand could not transform their

potentially unreasonable probable cause determination into a reasonable

one.  Second, the police detectives were aware of ADA Rakaczewski's role and involvement in the investigation.  As such, ADA Rakaczewski was unable to give a neutral opinion on probable cause because he was arguably one of the investigators making probable cause determinations.

Moreover, qualified immunity exists, in part, to protect police officers in situations where they are forced to make difficult, split second decisions in circumstances that are tense, uncertain and rapidly evolving.  See Reedy, 615 F.3d 197 at 224 n.37; Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005).  The police detectives in the present case did not make any split second probable cause decisions.  As stated in the probable cause section supra, the police detectives conducted a sixteen (16) hour investigation.  The police detectives clearly were not in a situation where they were forced to make split second decisions in tense, uncertain and rapidly evolving circumstances.  Accordingly, the police detectives are not entitled to qualified immunity.

For the reasons stated above, viewing the unresolved factual issues in the light most favorable to plaintiffs, we decline to find qualified immunity shields ADA Rakaczewski, Detective Bentzoni and the police detectives from liability.

### D. Failure to Train/Supervise Monroe County, Municipalities, Pocono Mountain Police Commission, Pocono Mountain Regional Police Department and Chief Lewis[3]

Finally, we must address plaintiffs' municipal liability claims. As noted above, plaintiffs assert a failure to train and supervise claim against Monroe County, the municipalities, Pocono Mountain Regional Police Commission, Pocono Mountain Regional Police Department and Chief Lewis (hereinafter "municipal defendants"). After careful review, we find summary judgment should be granted to the municipal defendants.

Municipal liability under section 1983 is available only under certain circumstances. The standard first articulated in Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658 (1978), provides that "local governing bodies . . . can be sued directly under §1983 . . . where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. Thus, a municipality may not be held liable under section 1983 unless "the alleged

---

[3]Plaintiffs voluntarily dismiss their claims in Count VIII against the Pocono Mountain Regional Police Department, Chief Lewis and the Pocono Mountain Police Commission. (Pls.' Br. Opp. at 63 n.31, 69 n.36). Accordingly, the defendants' motions for summary judgment will be granted as unopposed.

unconstitutional action executes or implements policy or a decision

officially adopted or promulgated by those whose acts may fairly be said to

represent official policy." Reitz v. Cnty. of Bucks, 125 F.3d 139, 144 (3d

Cir. 1997) (citing Monell, 436 U.S. 658 at 690-91). Case law following

Monell has delineated three ways in which a municipality may be held

liable for the constitutional torts of its employee:

> First, the municipality will be liable if its employee acted
> pursuant to a formal government policy or a standard
> operating procedure long accepted within the government
> entity, Jett v. Dall. Indep. Sch. Dist., 491 U.S. 701, 737,
> (1989); second, liability will attach when the individual has
> policy making authority rendering his or her behavior an act
> of official government policy, Pembaur v. City of Cincinnati,
> 475 U.S. 469, 480-81 (1986); third, the municipality will be
> liable if an official with authority has ratified the
> unconstitutional actions of a subordinate, rendering such
> behavior official for liability purposes, City of St. Louis v.
> Praprotnik, 485 U.S. 112, 127 (1988).

McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005). Based on the

plaintiffs' claims, the second path to liability is the appropriate analysis.

Under Pembaur, "municipal liability may be imposed for a single

decision by municipal policymakers under appropriate circumstances."

475 U.S. at 480. "Where, as here, the policy in question concerns a

failure to train or supervise municipal employees, liability under section

50

1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." Carter, 181 F.3d at 357.  Thus, plaintiffs who seek to bring a claim for failure to train against local governments under section 1983 must: (1) identify the deficiency in training; (2) prove that the failure to remedy the identified deficiency constituted deliberate indifference on the part of the municipality; and (3) demonstrate a direct causal link between the deficiency in training and the deprivation on plaintiffs' federal rights. City of Canton v. Harris, 489 U.S. 378, 390-91 (1989); Woloszyn v. County of Lawrence, 396 F.3d 314, 324-25 (3d Cir. 2005).  We address the three-part test *in seriatim*.

### 1. Identified Deficiency in Training.

Plaintiffs contend the individual defendants lacked the proper interview and investigative techniques to work in the highly specialized area of rape and sexual assault investigations.  Specifically, the individual defendants were not trained in the standard use of cognitive behavioral interviews, kinesic interviews and/or the interview technique known as A to Z / Z to A.  (Luthcke Dep. at 8, 11-12, 17-18; Wagner Dep. at 10, 13 & 30; Doc. 71-4, Ex. D, Dep. of Lucas Bray (hereinafter "Bray Dep.") at 10-11;

51

Bohrman Dep. at 15, 16-19; Doc. 111-15, Ex. I, Martinelli Expert Report Part III (hereinafter "Martinelli Report III") at 14-26).

Additionally, plaintiffs' evidence demonstrates that the investigation of sexual assaults is often complex and requires a diverse background of knowledge of criminal statutes, interviewing techniques, forensics, search and seizure and the identification, collection and preservation of evidence. (Martinelli Report III at 14-15).  Although plaintiffs' identified this deficiency in training, the additional training may not have mattered because, as set forth below, the detectives failed to utilize the basic police training they already possessed.  (Id. at 14).

**2. Municipality's Failure to Remedy the Identified Deficiency Constitutes Deliberate Indifference**.

In limited circumstances, a municipality's decision not to train employees about their legal duty to "avoid violating citizens' rights may rise to the level of an official government policy for the purposes of Section 1983." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  Id.  As such, a municipality may be held liable for its failure to train employees only where that failure

amounts to "deliberate indifference to the [constitutional] rights of persons with whom the police come in contact." Id.; see also Doe v. Luzerne Cnty., 660 F.3d 169, 179 (3d Cir.2011).

Deliberate indifference is a stringent standard of fault "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick 131 S. Ct. at 1360 (quoting Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)). A plaintiff may prove deliberate indifference in one of two ways. First, "a pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." Id. Second, in a narrow range of circumstances, a single incident may constitute deliberate indifference when "in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Canton, 489 U.S. at 390.

In the present case, plaintiffs' rely on the second, or single-incident, theory to prove deliberate indifference. Plaintiffs contend the probable cause violations were the "obvious" consequences of the municipal

defendants failing to provide specific training. The identified deficiency in training, however, fails to demonstrate deliberate indifference in two ways. First, the need for more or different training was not obvious because, as stated in the probable cause sections underline supra, the individual defendants failed to utilize basic police skills they already possessed.

Specifically, a reasonably trained detective would have chosen to reinterview AJ and TM to evaluate their inconsistent statements. Additionally, the individual defendants could have arranged for AJ and TM to make "pretext phone calls" to plaintiffs in an attempt to get one of the suspects to admit the sexual assault. Finally, the individual defendants failed to conduct a timely investigation by not confirming plaintiffs' stories until February 25, 2008, two weeks after the investigation began. Simply put, the need for more or different training was not obvious because reinterviewing witnesses, pretextual phone calls and following through on investigations are basic police skills.

Second, comparing the present case to the Canton single-incident hypothetical further reveals a lack of deliberate indifference.[4] The Canton

---

[4] In Canton, the Supreme Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitations on the use of deadly force. 489 U.S. at 390 n.10.

hypothetical assumes armed police officers have no knowledge of the constitutional limits on the use of deadly force.  Here, the individual defendants had a thorough understanding on the constitutional limits of probable cause because each provided an accurate recitation of the legal definition of probable cause.  (See Luthcke Dep. at 8; Wagner Dep. at 9, 15; Bohrman Dep. at 8; Bray Dep. at 9).  Moreover, the individual defendants correctly acknowledged the role exculpatory evidence plays in the decision to charge a suspect with a crime.  (Luthcke Dep. at 9; Wagner Dep. at 5-6; Bohrman Dep. at 26-28; Bray Dep. at 20).  Plaintiffs' complaint therefore cannot rely on the complete lack of an ability to cope with constitutional situations underlying the Canton hypothetical.

The court does not assume police officers will always make correct probable cause determinations.  But, municipal liability is not established by showing that additional training would have been helpful in making difficult probable cause decisions.  See Connick, 131 S. Ct. at 1363-64

---

Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle the situation will violate citizens' rights," the Supreme Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights.  Bryan Cnty., 520 U.S. at 409.

(Proving that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury causing conduct will not suffice.)  Accordingly, the municipalities failure to remedy the identified deficiency in training does not constitute deliberate indifference.

**3.  Direct Causal Link Between the Deficiency in Training and the Violation of Plaintiffs' Federal Rights.**

Finally, plaintiffs must demonstrate a direct causal link between the deficiency in training and the deprivation on plaintiffs' federal rights. "[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury."  Canton 489 U.S. at 391. Plaintiffs must still prove that "the deficiency in training actually caused the police officers' indifference" to their constitutional rights.  Id.  They have failed to do so.

In the present case, plaintiffs cannot meet this rigorous standard of causation.  Plaintiffs' constitutional violations were not caused by the municipalities' failure to better train their employees.  Rather, the individual defendants' failure to utilize police skills that they already possessed violated plaintiffs' constitutional rights.  To find causation on the facts in this case would engage the federal courts in an endless second-guessing

of municipal training programs or force federal courts into the realm of prediction and speculation as to how a better or different training program may have prevented constitutional violations. Ergo, we will grant summary judgment in favor of the defendants on plaintiffs' failure to train claims.

**CONCLUSION**

For the reasons stated above, the defendants' motions for summary judgment will be granted in part and denied in part. The motion will be granted with respect to plaintiffs' malicious prosecution claim against Detective Bentzoni. The motions will be granted with respect to plaintiffs' failure to train claims against Monroe County, the Municipalities, Pocono Mountain Regional Police Commission, Pocono Mountain Regional Police Department and Chief Lewis. the motions will be denied with respect to all other parties and counts.

Thus, the remaining counts are: Count I, false arrest and false imprisonment against Defendant Detectives Luthcke, Bohrman, Bray, Wagner and Bentzoni; Count II, false arrest against Defendant ADA Rakaczewski in his investigative capacity; and Count IV, malicious prosecution against Defendant Detectives Luthcke, Bohrman, Bray and Wagner. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM SPIESS; KASHEEN THOMAS; GENE THOMAS, II; JALEEL HOLDEN and JOSE LACEN,** | : : : : | No. 3:10cv287 |
| **Plaintiffs** | : | (Judge Munley) |
| **v.** | : | |
| | : | |
| **POCONO MOUNTAIN REGIONAL POLICE DEPARTMENT; TOBYHANNA TOWNSHIP; MOUNT POCONO BOROUGH; TUNKHANNOCK TOWNSHIP; COOLBAUGH TOWNSHIP; CHIEF HARRY W. LEWIS; RICHARD W. LUTHCKE; JOHN P. BOHRMAN; LUCAS BRAY; CHRIS WAGNER; MONROE COUNTY; A.D.A. MICHAEL RAKACZEWSKI; DET. WENDY BENTZONI and POCONO MOUNTAIN REGIONAL POLICE COMMISSION,** | : : : : : : : : : : : : : : : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 26th day of March 2013, upon consideration of defendants' motions for summary judgment, it is HEREBY **ORDERED** as follows:

1. Defendant Chris Wagner's motion for summary judgment (Doc. 69) is **DENIED**;

58

2.   Defendant John P. Bohrman's motion for summary judgment (Doc. 70) is **DENIED**;

3.   Defendants Wendy Bentzoni, A.D.A. Michael Rakaczewski and Monroe County's motion for summary judgment (Doc. 74) is **GRANTED** in part and **DENIED** in part as follows:

   a.   The motion is **GRANTED** with respect to plaintiffs' malicious prosecution claim, Count IV, against Wendy Bentzoni.

   b.   The motion is **GRANTED** with respect to plaintiffs' failure to train claim, Count IX, against Monroe County.  Monroe County is **DISMISSED** from the case.

   c.   The motion is **DENIED** in all other aspects.

4.   Defendant Chief Harry W. Lewis' motion for summary judgment (Doc. 76) is **GRANTED**.  Chief Harry W. Lewis is **DISMISSED** from the case;

5.   Defendant Lucas Bray's motion for summary judgment (Doc. 78) is **DENIED**;

6.   Defendant Richard W. Luthcke's motion for summary judgment (Doc. 80) is **DENIED**; and

7.    Defendants Pocono Mountain Regional Police Commission,

      Coolbaugh Township, Mount Pocono Borough, Pocono Mountain

      Regional Police Department, Tobyhanna Township and

      Tunkhannock Township's motion for summary judgment (Doc. 82) is

      **GRANTED**.  Pocono Mountain Regional Police Commission,

      Coolbaugh Township, Mount Pocono Borough, Pocono Mountain

      Regional Police Department, Tobyhanna Township and

      Tunkhannock Township are **DISMISSED** from the case.

                              **BY THE COURT:**


                              **s/ James M. Munley**
                              **JUDGE JAMES M. MUNLEY**
                              **United States District Court**